IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CHAUNCEY LEE MARSHALL,               )
                                     )
                 Plaintiff,          )
                                     )
         v.                          )          1:18CV709
                                     )
GREENSBORO POLICE SGT. RYAN 4TH      )
PRECINCT, et al.,                    )
                                     )
                 Defendants.         )

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

I. Procedural Background/Pending Motions

This is a *pro se* civil rights action filed under 42 U.S.C. § 1983 by Plaintiff Chauncey Lee Marshall, an inmate in the North Carolina Department of Public Safety. The Complaint attempts to set out claims against several persons, sets of persons, or entities. It alleges that Defendants Sergeant Ryan and Officer Underhill, patrol officers with the Greensboro Police Department, arrested Plaintiff using excessive force and then refused him proper medical treatment until he confessed to a robbery. The Complaint also alleges that, during Plaintiff's pretrial detention in the Guilford County Detention Center in Greensboro, North Carolina, then-Sheriff B.J. Barnes improperly housed Plaintiff and denied him sufficient medical treatment. Finally, the Complaint claims that Defendant "Nurse Erin/Mental & Medical Healthcare Providers" also provided inadequate medical treatment. The Court ordered the matter to proceed based on this initial Complaint.

An initial round of service or attempted service of summonses in the case resulted in summonses being issued for Defendants Barnes, Underhill, Ryan, and an entity labeled by Plaintiff as "Guilford County Jails Healthcare Provider." All of those summonses were returned executed except the summons for Defendant Barnes. The summons for "Guilford County Jails Healthcare Provider" reflects that it was served on "Tom Sybesma Regional Manager." [Doc. #9.] Plaintiff then filed a Motion [Doc. #14] seeking to substitute Sheriff D. Rogers for Sheriff B.J. Barnes because Plaintiff learned that Rogers, not Barnes, was the current Sheriff of Guilford County. The Court granted that Motion. Summonses were then issued for Guilford County Sheriff D. Rogers, Guilford County Jail Medical Provider C/O Tom Sybesma Regional Manager, and Guilford County Jail Mental Health Provider. [Doc. #20.] The summonses for Rogers and the Guilford County Jail Medical Provider were returned executed, with Tom Sybesma again being listed as the person receiving the latter summons. [Doc. #25.] However, the summons for Guilford County Jail Mental Health provider was returned unexecuted. (Id.)

Following the above events, Defendants Ryan and Underhill successfully pursued a Motion to Dismiss that resulted in the dismissal of official capacity claims against them. (See Order [Doc. #60].) The other claims in the case proceeded through discovery and the parties have now filed a number of dispositive motions which are pending. Specifically, they are: a Motion to Enforce Order for Dismissal of All Unserved Defendants [Doc. #76] filed by Tom Sybesma, a Motion for Summary Judgment [Doc. #79] filed by Defendant Rogers, a Motion for Summary Judgment [Doc. #91] filed by Defendants Underhill and Ryan, a Motion [Doc. #102] filed by Plaintiff to deny Sybesma's Motion to Enforce, a Motion for Summary

Judgment [Doc. #110] filed by Plaintiff, and a Motion to Seal [Doc. #85]. All of these Motions will be discussed in turn.

## II. Sybesma's Motion to Enforce and Plaintiff's Motion to Deny

Tom Sybesma, an employee of Wellpath (formerly known as Correct Care Solutions, LLC), the healthcare provider at the Guilford County Detention Center, filed a Motion under Federal Rule of Civil Procedure 4(m) to dismiss all Defendants not served in the case. Sybesma received a summons in the case addressed to him, as well as a summons addressed to "Guilford County Jails Healthcare Provider," but contends that these summonses are inadequate and that he, Wellpath/Correct Care, and "Guilford County Jails Healthcare Provider" are not proper Defendants in the case and/or were not properly served.

The summons to "Guilford County Jails Healthcare Provider" was returned executed on December 13, 2018, while the summons to Sybesma was returned executed on February 6, 2019. Sybesma waited many months, and until after the close of discovery in this case, to file his current motion. He does not explain his delay, differentiate his Motion as substantively different from one contesting service of process under Rule 12(b)(5) of the Federal Rules of Civil Procedure, or argue that his Motion is timely under that Rule. Complicating matters further is that Plaintiff is an incarcerated pro se inmate who apparently believes, albeit erroneously, that he moved to substitute Tom Sybesma and Correct Care Solutions for the unknown "Mental and Medical Healthcare Providers" listed in the Complaint.[1] The Court would be inclined to give Plaintiff considerable leeway in determining whether he has

---

[1] The record reveals that he filed a Motion [Doc. #14] to Substitute Defendant Rogers for former Sheriff B.J Barnes. However, the docket does not include a motion related to the healthcare providers.

3

demonstrated "good cause" sufficient to avoid dismissal under Rule 4(m) and be allowed further time to name and serve a proper healthcare defendant. See Fed. R. Civ. P. 4(m) ("if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period"). Further, any dismissal under Rule 4(m) is without prejudice, which means that Plaintiff could simply bring his suit again, leading to additional further litigation.

Addressing Movant Sybesma's Motion and Plaintiff's related Motion seeking to deny it would raise all of these issues and likely result in either a serious delay of the present case or piecemeal litigation involving a second case--outcomes the Court seeks to avoid if possible. As it happens, the issue of Plaintiff's healthcare while at the Guilford County Detention Center is also the subject of Defendant Rogers' Motion for Summary Judgment and will be fully addressed on its merits in association with that motion. As will be discussed, the results of that analysis negate any need to allow Plaintiff further time to amend his Complaint, add parties, or serve parties. Therefore, the Court will not discuss the Motions related to service issues and unserved parties further, but will proceed to address the pending summary judgment motions.

### III. Summary Judgment Standard

Summary judgment is appropriate when no genuine issue of material fact exists. A genuine issue of fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A court considering a motion for summary judgment must view all facts and draw all reasonable inferences from the evidence before it in the light most favorable to the non-moving party. Id. The proponent of summary judgment "bears the initial burden of

4

pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If the movant carries this burden, then the burden "shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson, 477 U.S. at 247-48). A mere scintilla of evidence supporting the non-moving party's case is insufficient to defeat a motion for summary judgment. See, e.g., Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994); see also Anderson, 477 U.S. at 248 (non-moving party may not rest upon mere allegations or denials).

### A. Defendant's Ryan and Underhill's Motions for Summary Judgment

#### 1. Plaintiff's Facts

Plaintiff submitted essentially no evidence in this case beyond exhibits attached to his Motion for Summary Judgment.[2] Those exhibits consist of only a copy of some of the summonses in the case and a copy of mental health treatment policies from the Guilford County Detention Center. Other than these exhibits, Plaintiff presents only the allegations set out in his Complaint, which are as follows.

Plaintiff's allegations pertaining to his arrest are that Defendants Ryan and Underhill "slammed [him] on [his] back, head, and arms while handcuffed behind [his] back causing a concussion, broken wrist, [and] nerve damage." (Complaint [Doc. #2], § IV.) He adds on an attached page that "once [he] was down," they continued "to knee and elbow [him] even though [he] was fully subdued and screaming about the pain of [his] arm." (Id.) He also

---

[2] At points in his briefing, Plaintiff requests further discovery. However, the period for discovery in the case expired long ago and Court will not restart discovery.

5

contends that Defendants Ryan and Underhill "denied medical attention until [Plaintiff] confessed to alleged crimes" and that they did so "even after they observed [his] injuries, and [he asked] for medical attention. (Id.)

### 2. Defendants Ryan and Underhill's Facts

In support of their Motion for Summary Judgment, Defendants Ryan and Underhill present the following facts as established by their Affidavits (Ryan Aff. [Doc. #95]; Underhill Aff. [Doc. #100]), the investigation records surrounding Plaintiff's arrest (Estes Aff. [Doc. #93], Attach.), the Affidavit of Sergeant R.E. Ferrell [Doc. #96] who helped interrogate Plaintiff after his arrest, and a computer disc [Doc. #98] containing video recordings of Plaintiff's arrest and interrogation.

Ryan states that he had previously reviewed documents related to a robbery that occurred at a Walgreens store on January 28, 2017, including a photograph of the suspect and his vehicle. (Ryan Aff. ¶ 3.) On February 9, 2017, he assisted with a call at a local hotel. (Id. ¶ 4.) Defendant Underhill then radioed him and asked him to return to the hotel because Underhill had spotted a vehicle and person matching the descriptions from the Walgreens robbery. (Id.) Another officer, Officer Douglas, also responded. (Id.) During the interaction, Ryan encountered Plaintiff and became concerned that he might flee after seeing him tie his shoelaces. (Id. ¶ 5.) The officer therefore handcuffed Plaintiff behind his back while they confirmed his identity. (Id.) Plaintiff claimed to be "Omar Patterson" with a birth date of July 26, 1989. (Id. ¶ 6.) However, he later changed that date twice before eventually admitting that he was Chauncey Marshall and giving a correct birth date. (Id.) Defendant Underhill then returned to his vehicle and confirmed that Plaintiff appeared to be the person in the

6

robbery photograph and that there was a warrant for his arrest. (Id. ¶ 7.) He then told Plaintiff he was under arrest. (Id.)

Underhill searched him and removed items from his pockets. (Id. ¶ 8.) At that point, Defendant Ryan held Plaintiff's right arm and Defendant Underhill held his left. (Id.) As the officers began to place Plaintiff in Underhill's patrol car, "Plaintiff began pulling away from [them], twisting and turning to get out of [their] grasp." (Id.) They took him to the ground, with Ryan controlling his legs. (Id.) Ryan commanded him to stop resisting or be restrained further. (Id.) Once Plaintiff calmed down, Ryan released his legs and the officers lifted him to his feet. (Id.) At that point, Plaintiff yelled that his arm was broken and also "requested his hat." (Id. ¶ 9.)

Defendant Underhill's Affidavit relates essentially identical events during the initial arrest except that it adds that when the officers took Plaintiff to the ground, Underhill had his arm across Plaintiff's chest as Ryan held Plaintiff's legs. (Underhill Aff. ¶ 8.)

As for the events following the initial arrest, Underhill states that he took Plaintiff to a police substation, at which time Plaintiff asked for a cigarette, which Underhill denied him. (Id. ¶ 10.) Plaintiff also responded negatively when asked if anything other than his arm hurt. (Id.) Underhill states that Plaintiff was placed in an interrogation room and instructed to knock on the door if he needed anything. (Id. ¶ 11.) Plaintiff asked to use the restroom several times and for several glasses of water and a tissue. (Id.) He also asked when he would be questioned. (Id.) However, he did not request medical treatment. (Id.) About three hours after Plaintiff first entered the interrogation room, or around 11:40 a.m., Underhill noticed Plaintiff rubbing his wrist and Plaintiff indicated that it was still bothering him. (Id. ¶ 12.) Underhill informed

Detective Ferrell of this fact and Emergency Medical Services (EMS) was contacted. (Id.) Plaintiff stated at 12:17 p.m. that he wanted to complete his interview before going to the hospital and refused to be transported by EMS. (Id. ¶ 13.) He later asked the Greensboro Police to transport him to the hospital, which Underhill then did at 12:46 p.m. (Id. ¶ 14.)

### 3. Discussion

Plaintiff's allegations are that Defendants Ryan and Underhill used excessive force in arresting him and that they improperly denied him medical attention until he confessed. Turning first to the allegation of excessive force, the Fourth Amendment prohibits police officers from using unreasonable force in the course of making an arrest. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. Graham v. Connor, 490 U.S. 386, 396 (1989) (internal quotations omitted). In evaluating such a claim, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397. Relevant factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. Courts will not make this assessment with the benefit of hindsight; instead, defendants' actions will be viewed from that of a reasonable officer at the time. Id. at 396-97.

The Court will examine these factors in light of the events leading to Plaintiff being taken into custody. Plaintiff omits entirely the facts that led to him being taken into custody.

8

Therefore, the facts supplied by Defendants Ryan and Underhill are undisputed and show that they recognized Plaintiff and his vehicle from the earlier robbery of the Walgreens store at knife point. Plaintiff made possible preparations to flee when officers approached him, leading to him being handcuffed. After initially lying to the officers and causing a delay, Plaintiff admitted his identity and was taken into custody. However, as the officers began to place Plaintiff into a police cruiser, he turned and attempted to flee, causing them to take him to the ground. The first allegation in the Complaint is that Defendants Ryan and Underhill "slammed" Plaintiff onto the ground, injuring his wrist and head, before continuing to knee and elbow him after he submitted and screamed about an injury to his arm. Defendants Ryan and Underhill respond that they only took Plaintiff to the ground and laid on his legs and upper body to control him until he calmed down enough to be returned to his feet and placed in the patrol car.

There could be a potential dispute of fact about the force used except for the existence of the footage from Ryan's and Underhill's body cameras. (Manually Filed Disc [Doc. #98], Ryan_20170209063.mp4 and Underhill_20170128032(1).mp4.) That footage, which includes both sound and video, is entirely clear and fully supports their version of events. As the officers began to place Plaintiff into Underhill's car, Plaintiff turned 180 degrees and attempted to run between the officers. (Both Videos, Approx Time Stamp 13:32:55-:59.) Defendant Ryan stopped him by grabbing or pushing high on Plaintiff's body, while Defendant Underhill caught hold of the handcuffs behind Plaintiff's back and placed a hand behind Plaintiff's left knee, pulling that leg out from under him and causing him to go to the ground. (Id., 13:33:00-:15.) Plaintiff was in no fair sense of the word "slammed" to the ground by the officers, but

rather went backward in a semi-controlled manner, appearing to land mostly on his buttocks, but possibly also on his handcuffed wrists. Ryan immediately held Plaintiff's legs, while Underhill placed his forearm on Plaintiff's chest. (Id.) They then simply held him to the ground for about a minute until he calmed down and agreed to be placed in the car. (Id., 13:33:15-:34:30.) They did not, in any way whatsoever, knee or elbow Plaintiff either to subdue him or after he was subdued. Plaintiff also made no mention of any injury or pain at this point and screamed only about being innocent of any robbery. Once Plaintiff calmed, the officers lifted him to his feet. Plaintiff stated that his arm was broken at that time, but then immediately became concerned about his hat and requested that the officers retrieve it from the ground for him, which they did, placing it on his head. (Id., 13:34:30-:59.) The officers put him in the car without further incident.

"[W]hen a video 'quite clearly contradicts the version of the story told by [the plaintiff] . . . so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" Witt v. W. Va. State Police, Troop 2, 633 F.3d 272, 276 (4th Cir. 2011) (quoting Scott v. Harris, 550 U.S. 372, 378, 380 (2007) (alteration in original)). A court should not "reject a plaintiff's account on summary judgment whenever documentary evidence, such as a video, offers [only] *some* support for a governmental officer's version of events." Id. at 276 (emphasis in original). Rather, "when documentary evidence 'blatantly contradict[s]' a plaintiff's account 'so that no reasonable jury could believe it,' a court should not credit the plaintiff's version on summary judgment." Id. at 276-77 (quoting Scott, 550 U.S. at 380).

10

Here, the events depicted in the body camera videos can in no way be described as a use of excessive force by Defendants Ryan and Underhill. Plaintiff, a suspect in an armed robbery, attempted to flee while handcuffed, causing them to engage in the legitimate governmental purpose of stopping his flight and restraining him in order to effect his arrest. In doing so, they used only a minimum of force to take Plaintiff to the ground and restrain him until he stopped resisting arrest and allowed himself to be placed into a car for transport. The allegations in the Complaint that Ryan and Underhill slammed Plaintiff to the ground, kneed, and elbowed are simply false in light of the video evidence, as is Plaintiff's contention that he complained about his arm prior to their lifting him to his feet. Therefore, Plaintiff's excessive force claims fail and Defendants Ryan and Underhill should be granted summary judgment on those claims.

To the extent that there could be a constitutional violation, Defendants Ryan and Underhill argue that they are entitled to qualified immunity. A court generally considers first in the qualified immunity analysis whether a constitutional violation has occurred. Williams v. Ozmint, 716 F.3d 801, 805 (4th Cir. 2013). The above discussion concludes that Plaintiff has not established a constitutional violation. If there were a constitutional violation, the Court next considers "whether that right violated was clearly established at the time of the official's conduct." Id. "The proper inquiry focuses whether 'it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted' . . . or whether the state of the law [at the time of the incident alleged] gave 'fair warning' to the officials that the conduct was unconstitutional." Clement v. Gomez, 298 F.3d 898, 906 (9th Cir. 2002) (internal citations omitted). Here, the evidence clearly reflects a non-compliant detainee resisting verbal and

physical efforts to restrain him. Under these circumstances and in light of the findings above, the Court concludes that it would not at all be clear to a reasonable officer that the conduct of Ryan or Underhill was unlawful. Therefore, summary judgment would also be appropriate based on qualified immunity.

Plaintiff's other allegation against these Defendants is that they ignored his injured arm and detained him in an interrogation room until he confessed. This claim fails similarly. Because of his status as a pretrial detainee at the time of the events alleged, the Court evaluates Plaintiff's claim of deliberate indifference to his medical needs under the due process clause of the Fourteenth Amendment, rather than under the Eighth Amendment standard applicable to convicted prisoners. City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983); see Bell v. Wolfish, 441 U.S. 520, 535 (1979). In practice however, the standards are the same for both pretrial detainees and convicted persons. See Brown v. Harris, 240 F. 3d 383, 388-89 (4th Cir. 2001) (holding that a pretrial detainee is entitled to the protections of due process, but concluding that the court need not decide whether the prisoner was convicted or a pretrial detainee because the standard is the same). Plaintiff must establish that Defendants acted with "deliberate indifference" to his "serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104 (1976); Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). The "serious medical need" component is objective and is a medical condition that has been diagnosed by a physician as requiring treatment or one that is so obvious that even a non-physician would recognize the need for a doctor's attention. Iko, 535 F.3d at 241. The deliberate indifference component is judged subjectively, meaning that the defendant knew of and disregarded the risk posed by the serious medical need. Id. This showing is a "particularly high bar to recovery," and a showing

12

of mere negligence will not meet it. Id. To have been deliberately indifferent, the defendant must actually know of the risk of harm to the inmate, and must also have known that his actions were insufficient to mitigate the risk of harm to the plaintiff from his serious medical need. Id.

Here, there is no evidence in the record that Defendant Ryan had any contact with Plaintiff after placing him in Defendant Underhill's patrol car. At that point, the only knowledge that Defendant Ryan had of any injury to Plaintiff were the brief initial statements by Plaintiff that his arm was broken. However, as noted earlier, Plaintiff did not persist in this vein, but instead became concerned about his hat and demanded that the officers retrieve it for him. He then made no further statement regarding his arm in Defendant Ryan's presence. This fact, coupled with Plaintiff's immediate lack of follow-up or concern for any injury, was not sufficient to put Defendant Ryan on notice of any serious medical need. Further, Ryan was not later involved in Plaintiff's transport, care or custody. Therefore, even if he knew of a need, he was not present or involved with Plaintiff so that he could be found to have exercised deliberate indifference toward the injury. He would also be entitled to qualified immunity on this claim. For all of these reasons, Defendant Ryan's Motion for Summary judgment should be granted.

Regarding, Defendant Underhill, he remained in contact with Plaintiff and was at least one of several officers responsible for his custody for several hours. Two brief body camera videos exist of the time Plaintiff was placed in Defendant Underhill's car, but before he arrived at the police substation. (Manually Filed Disc, Underhill_20170128032(2).mp4 and Underhill_20170128032(3).mp4.) In the first, Defendant Underhill uses a computer in his

13

squad car to show Plaintiff digital photographs from the Walgreens robbery. They discuss whether or not the photographs depict Plaintiff and the vehicle he was driving when arrested. Plaintiff vigorously insists that they do not and that he did not commit the robbery. He does not mention his arm or any injury or a need for medical attention. In the second video, Plaintiff states he was snorting cocaine that morning and he and Underhill discuss five dollars that Plaintiff possessed. No other conversation is recorded. These videos do not demonstrate any serious medical need or reflect that Plaintiff was in need of emergency medical treatment at that point.

Brief body camera videos also exist of Plaintiff being removed from Defendant Underhill's cruiser and walked into an interrogation room in the police substation. (Manually Filed Disc, Underhill_20170128032(4).mp4 and Felicianoc_20170128032.mp4.) When Defendant Underhill opens the door, Plaintiff exits the car under his own power and assures the officers he will not run again. (Underhill_20170128032(4).mp4, Time Stamp 13:55:44-:45.) Plaintiff asks to smoke a cigarette before entering the building, to which Defendant Underhill replies that he needs to talk to detectives first and that he can then smoke a cigarette if the detectives allow it. (Id. at 56:00-06.) Underhill then asks if anything other than Plaintiff's arm is hurt, to which Plaintiff states his arm is broken and swollen. (Id. at 56:15-:20.) Underhill asks which arm, to which Plaintiff replies, "left." (Id. at 56:22-24.) He does not exhibit any obvious pain, or request medical attention. Defendant Underhill leaves Plaintiff's presence once he reaches the interrogation room. (Id. at 57:30.) Body camera footage from the other officer escorting Petitioner, Officer Feliciano, continues after Plaintiff enters the room. Officer Feliciano begins to remove Plaintiff's handcuffs before stating that he needs

14

to check with Underhill first. (Felicianoc_20170128032.mp4, Time Stamp 13:57:49-52.) Plaintiff asks him to at least adjust the handcuffs because of swelling and Feliciano appears to attempt to do this, but instead decides to remove the cuffs after Plaintiff makes a sound indicting some pain. (Id. at 57:53-58:30.) Officer Feliciano asks if Plaintiff has been to the hospital, to which Plaintiff replies that he has not, and then Defendant Underhill returns and confirms that it is Plaintiff's left arm that is injured. (Id. at 58:30-:44.) Plaintiff shows the officers his wrist and they briefly examine it. (Id. at :44-:49.) Feliciano exits the room and the video ends shortly thereafter.

Defendants also submitted just over three and a half hours of camera footage records of Plaintiff's stay in the interrogation room. (Manually Filed Disc, Cauncey Marshall cam1.) During most of the footage, Plaintiff is alone in the room. Generally speaking regarding his left hand and arm, Plaintiff at various times, fidgets, moves his hand and fingers, reaches into his pockets, pulls his pants up or adjusts them, blows his nose, and removes his jacket. In interacting with various officers and other persons in the room, he uses the arm to drink water, and makes gestures when talking. Plaintiff requests water to drink and to use the bathroom on multiple occasions, and asks multiple times each when he will be questioned and whether or when he can smoke a cigarette. He is also questioned by detectives regarding the Walgreens robbery and two bank robberies that he committed. At no point does he spontaneously mention his arm or any other injury or request medical treatment, nor does he appear to be suffering or in obvious pain. Plaintiff moves and uses the arm more or less normally and the most that can be said in his favor is that he appears to act carefully or gingerly with his left arm at times.

15

As far as notable particular occurrences, at 9:50 am an officer arrives to collect Plaintiff's DNA and fingerprints and take photographs of Plaintiff. Plaintiff cooperates without issue, moving and using his hands freely, including to remove his jacket and lift his shirt sleeves and shirt for photographs without difficulty or complaint. (Id. Time Stamp 9:51-:54.) The officer also photographs Plaintiff's wrist and the swelling and a red mark on the back of Plaintiff's head. (Id.) Plaintiff does not express discomfort or request medical attention during this process.

At 11:42 am, Defendant Underhill asks Plaintiff if his wrist hurts. He replies that it does and Underhill tells him that EMS will check his wrist. (Id. Time Stamp 11:42.) Plaintiff immediately switches subjects, asking why his girlfriend is being questioned and insisting that she does not know anything. (Id.) Detectives then arrive and question Plaintiff until EMS arrives at 12:09 pm. Plaintiff does not complain about his arm or request treatment at any point during the questioning that results in his confession to multiple robberies. During the EMS examination, Plaintiff is calm and responsive with no strong reactions to the manipulations of his hand and wrist by the medical workers. Plaintiff states that his wrist was broken previously and that this was an old injury that was "reinjured last night" or "this morning." (Id. Time Stamp 12:11:32; Time Stamp 12:12:30.) Unable to determine if Plaintiff's wrist is broken or not, the EMS workers offer to transport him to the hospital. (Id. Time Stamp 12:13:40-:14:45.) However, Plaintiff refuses, instead wanting to finish up with questioning and processing before allowing the police to take him to the hospital. (Id. Time Stamp 12:15:20.) He also insists, yet again, on being allowed to smoke a cigarette before going for treatment. (Id. Time Stamp 12:15:30.) Plaintiff then converses about his telephones, his

16

ID, his girlfriend, and an officer's accent before going to the bathroom again and then being removed from the interrogation room at 12:30. [3]

It is indisputable from the evidence as a whole that Defendant Underhill was aware of an injury to Plaintiff's arm from the time he placed him in his car until the time EMS arrived about four hours later. However, that injury had not been diagnosed by a doctor and would not have obviously needed treatment to a lay observer. In fact, even the EMS workers who examined Plaintiff were unable to determine the nature of his injury. Plaintiff complained immediately before being placed in Defendant Underhill's car about wrist pain, but thereafter voiced no serious complaints about his wrist and addressed the subject only when asked about it by officers or the EMS workers. During the hours between his arrest and being taken to the hospital, Plaintiff was perfectly comfortable making his needs known and requesting relief, whether to obtain water, a tissue for his nose, or trips to the bathroom. However, he still never requested medical treatment and continued to use his left arm and wrist in more or less a normal fashion at most times. Plaintiff's words and actions indicated that his injury was not so serious that it required immediate treatment. Further, Plaintiff's words and actions certainly would not have alerted Defendant Underhill to a need for emergency medical treatment. The assertion in the Complaint that Defendant Underhill kept him in an interrogation room and

---

[3] It is undisputed that officers then transported Plaintiff to the hospital for x-rays as he requested. The medical records from the hospital reflect that Plaintiff reported that he had fractured his wrist a month earlier and that he was having increased pain after his altercation with law enforcement officers. (Cabarrus-Dubois Aff. [Doc. #88], Ex. 1 at 207-208.) The hospital records reflect that Plaintiff had suffered a wrist fracture in December 2016. In comparing Plaintiff's new x-rays to images from December 2016, the radiologist (Dr. Liebkemann) noted that "I do not see a definite new fracture," and his impression was that "[t]here has been some healing response of the distal radial comminuted fracture"; that "[o]ne of the more medial fragments is somewhat more proximally displaced than it was previously"; and that there was a "[s]light increase in the positive ulnar variance." (Id. at 208-09, 214). Thus, the medical records reflect a prior wrist fracture in December 2016 that appears to have been aggravated by Plaintiff's interaction with officers on February 9, 2017.

17

denied him medical treatment until he confessed is a blatant mischaracterization of the facts as demonstrated very clearly by the videos discussed above. For all of these reasons, Plaintiff's claim that Defendant Underhill violated his constitutional rights by denying him medical treatment fails as a matter of law. Further, to any extent that a constitutional violation could be found to exist, Defendant Underhill would be entitled to qualified immunity under the analysis set out earlier. Defendant Underhill's Motion for Summary Judgment should be granted.

## B. Defendant Rogers's Motion for Summary Judgment

### 1. Exhaustion

Before discussing Defendant Rogers's arguments concerning the merits of Plaintiff's claims, the Court will first address an argument he raises that Plaintiff failed to properly exhaust his administrative remedies. Under the Prison Litigation Reform Act of 1995 (PLRA), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory and the Court cannot waive that requirement. Porter v. Nussle, 534 U.S. 516, 524 (2002). Nevertheless, lack of exhaustion is an affirmative defense, Jones v. Bock, 549 U.S. 199, 216 (2007), which means it must be proved by Defendant. However, if Plaintiff responds to that defense by claiming that administrative remedies were not "available," he must "show that a grievance procedure was not 'available,'" by "adduc[ing] facts showing that he was prevented, through no fault of his own, from availing himself of that procedure." Graham v. Gentry, 413 F. App'x. 660, 663 (4th Cir. 2011).

Defendant Rogers supplies documentation that, upon arrival at the Guilford County Detention Center, inmates are given an Inmate Handbook which contained the Detention Center's Inmate Requests and Grievance Policy. (Doub Aff. [Doc. #82], ¶ 8, Ex. 3.) That Policy states that an inmate seeking information or answers to questions should initiate an informal process by addressing the matter with an officer or employee who can attempt to provide an answer. (Doub Aff., Ex. 3, at 26.) If the employee cannot resolve the issue to the inmate's satisfaction, the employee can then issue an Inmate Request Form, which the Shift Commander will answer in five business days. This process can also be used by inmates to register and resolve complaints such as "an expression of pain, dissatisfaction or resentment for a particular event or action." (Id. at 27.)

Inmates can also initiate an informal grievance process by registering a complaint with an officer or employee, who will attempt a remedy. (Id.) If this does not satisfy the inmate, they must then complete an Inmate Request Form seeking a Grievance Form, which is issued by Shift Commanders or Classification/Grievance Officers, with carbon copies being created and retained. (Id.) Inmates must file a grievance within three days of the time they know or should know of the incident leading the grievance. (Id.) Once an inmate completes a Grievance Form, it is sent to the Division Commander who must respond within twenty-one days. (Id.) It may also be forwarded to the Bureau Commanders if it challenges facility policies and procedures. (Id.)

According to records retained by the Detention Center, Plaintiff filed thirteen Inmate Request Forms while incarcerated there. (Diehl Aff. [Doc. #89], ¶ 11.) However, all were resolved informally and none were followed by a request for a Grievance Form. (Id.) A review

19

of these documents reveals that Plaintiff filed Inmate Requests Forms raising issues connected to visitation problems, pictures, books, and a mobile card in his property, movement to a new bunk, an issue with his mail, clothing and writing materials, an indigent kit (four times), a bible, an indigent kit with extra paper, keeping some of his visitors a secret from other visitors, and more clothing and stamps. (Id., Ex. at 165-177.) None of these forms pertain to issues raised in the Complaint. In the end, Plaintiff filed no Grievance Forms while at the Detention Center. (Id.)

The Complaint alleges without elaboration that "it's S.O.P to deny request[s] for grievances or ignore the request period" (Complaint, §V, Attach. ¶ 3.), but the Complaint also indicates that Plaintiff filed grievances concerning the issues raised therein and fully exhausted his remedies (id. § VI). Confronted with documentary evidence of his complete failure to exhaust, or even attempt to exhaust, his claims, Plaintiff responds on the exhaustion issue by saying that his Response Brief [Doc. #104] is accompanied by documents showing that he tried "to exhaust on several occasions for different reasons," tried to exhaust on two other occasions by writing "the administration," and also that he was placed in administrative segregation on two occasions for requesting grievance forms. (Plaintiff's Response Br. at 1, 6.)[4] In what was docketed as a Supplemental Response [Doc. #108] filed after Defendant Rogers' Reply, Plaintiff adds that conditions were generally bad in the medical area of the Detention Center where he was housed and that he raised his medical "grievances" to nurses. Contrary to Plaintiff's contention, there are no exhibits attached to the Response Brief which

---

[4] Plaintiff combined two separate documents into one filing. Therefore, pinpoint cites to that document are to the page number listed in the footer of the Court's Electronic Case Filing database.

demonstrate any attempt by Plaintiff to file a grievance using the Detention Center's procedure to grieve claims related to the Complaint. As for writing the administration and notifying nurses of problems, those are not a part of the Detention Center's grievance process. In the end, Plaintiff submits absolutely no evidence that he exhausted or attempted to exhaust his administrative remedies and it is readily apparent from Defendant Roger's evidence that Plaintiff neither utilized nor attempted to utilize the Detention Center's administrative grievance process for any claim listed in the Complaint. He did not exhaust his remedies as required by statute, meaning that dismissal of his claims against Defendant Rogers is required under § 1997(e). Further, as discussed below, Plaintiff's claims fail even if the Court were to find them exhausted.

### 2. Plaintiff's Facts

The remaining issues in the case involve Plaintiff's alleged treatment while housed in the Guilford County Detention Center. The Complaint claims that the Sheriff and/or the healthcare provider at the Detention Center denied Plaintiff "medical treatment for months while keeping [him] locked in 'medical administrative segregation'" and that what treatment was given did not include a surgery recommended for Plaintiff's arm by a specialist. (Complaint, § V.) Plaintiff claims that the situation eventually "caused him to desire death and attempt suicide after 3 attempts to see mental health." (Id.) He adds on the attached page of facts that he "filed several request[s] for the month of May" before giving up and cutting his "wrist on May 30 after 3 weeks of verbal, and paper requests[s] being ignored." (Id.)]

At additional points in the recitation of facts, the Complaint alleges that Plaintiff was held in segregation with canteen, phone, recreational, and email restrictions, as well as no

21

television, newspapers, or outside news and that he suffered a staph infection after being placed in an unclean cell and being denied cleaning supplies following his suicide attempt. (Id.)

### 3. Defendant Roger's Facts

In support of his Motion for Summary Judgment, Defendant Rogers presents the following facts, as set out in affidavits and extensive documentation. Following Plaintiff's arrest and confession, he was transported to Cone Health Emergency Department and treated for a fractured wrist with displaced fragments. (Cabarrus-Dubois Aff. [Doc. #88], Ex. 1 at 207-214.) He then entered the custody of the Greensboro Sheriff's Department and remained there from February 9, 2017 until September 8, 2017, when he transferred to the custody of the North Carolina Department of Public Safety. (Diehl Aff. [Doc. #89] ¶ 4.) Upon arrival at the Detention Center, Plaintiff was screened and then placed in medical segregation due to his injury. (Id. ¶ 5.) That status was then reviewed every 15 days. (Id. Aff. ¶ 5 and Ex. 1 at 217-220.) Medical care was provided to Plaintiff by Correct Care Solution, LLC, with whom the Guilford County Sheriff's Department contracted for all medical care of its prisoners. (Barnes Aff. [Doc. #81] ¶ 8.)

A few days after Plaintiff's arrival at the Detention Center, on February 15, 2017, he completed a medical form stating that he was experiencing violent, helpless, hopeless, and fatalistic thoughts. (Cabarrus-Dubois Aff, Ex. at 70.) This led to him being placed on suicide watch for two days, after which he was removed from that status because he informed medical staff that he had neither thoughts of self-harm nor a plan to harm himself and that it was a mistake to document his thoughts in the manner he did. (Id.) Thereafter, staff conducted

22

mental health evaluations on seven occasions between the time Plaintiff was taken off suicide watch and May 24, 2017. (<u>Id.</u> at 78-81.) Although an evaluation on March 14, 2017, stated that Plaintiff had increased frustration concerning his wife and her refusal to help him get out of jail, he was "not experiencing acute psychiatric problems." (<u>Id.</u> at 13.)

On March 29, 2017, Plaintiff saw an outside specialist, Dr. Kuzma, for a follow-up on his wrist injury. (<u>Id.</u> at 173.) CT imaging was performed at the time of the injury and again April 13, 2017, with a nerve conduction study also being ordered. (<u>Id.</u> at 175, 184-88, 203-4.) When Kuzma evaluated Plaintiff again on May 19, 2017, he noted problems with the healing of Plaintiff's wrist fracture and they discussed the option of surgery to correct the problems. (<u>Id.</u> at 180-83.)

During this time, on April 28, 2017, Plaintiff filed another Healthcare Request form seeking treatment for painful boils under his arms, which led to led to treatment with antibiotics early in May of 2017. (<u>Id.</u> at 297, 268-77.) Then, on May 24, 2017, Plaintiff filed a third Healthcare Request form stating, "I do not want to hurt anyone or myself I just need to speak to someone in the Mental Health Department. . . ." (<u>Id.</u> at 296.) A mental health check performed that day found that he was cooperative and calm with no suicidal or homicidal ideation being noted. (<u>Id.</u> at 78.) However, six days later, on May 30, 2017, Plaintiff used a razor to cut his injured left wrist in an attempt to kill himself after an argument with his wife. (<u>Id.</u> at 196, 225.) Plaintiff was transported to a hospital, treated with sutures, and released back to the Detention Center. (<u>Id.</u> at 192-201, 221-26.) The wound did later become infected, leading to treatment on multiple occasions between May 31, 2017 and June 16, 2017, when the wound healed enough for removal of the sutures. (<u>Id.</u> at 255-66.) Correct Care staff

23

thereafter engaged in a number of mental health checks and evaluations between June 2, 2017, and Plaintiff's transfer in September. (Id. at 75-78.) These led to Plaintiff being diagnosed with bipolar disorder and receiving medication. (Id. at 2, 82-83.)

Correct Care staff also continued to work with Plaintiff's wrist fracture issue after he healed sufficiently from his self-inflicted wound and subsequent infection. On August 4, 2017, a staffer made a note that she spoke to the scheduler for Dr. Kuzma at the Hand Center, that the Hand Center had received a copy of the Plaintiff's nerve conduction study, and that the scheduler was attempting to find a time for Plaintiff to receive surgery for his hand. (Id. at 253.) A subsequent note on September 8, 2017 also notes this, as well as the fact that the scheduler reported that the Doctor had been overbooked, but they were attempting to find a time for the surgery. (Id. at 252.) However, Plaintiff was transferred out of the Detention Center on that date and Correct Care and Defendant Roger's handling of his medical issues ended.

As for Plaintiff's claims related to segregation during his confinement in the Detention Center, he was, as noted above, initially placed in medical segregation due to his broken wrist, then placed on suicide watch on February 15, 2017, based on statements he made to medical personnel, and removed from suicide watch status two days later, also based on his own statements. Next, on February 26, 2017, Plaintiff asked to be removed from medical segregation, but was told to "consult medical" and the transfer apparently did not occur. (Diehl Aff., Ex. at 167.) He did not file another such request. (Id. at 165-77.) On April 23, 2017, Plaintiff was disciplined for failing to enter a locked passageway when ordered and on May 22, 2017, he was cited for interfering with staff during a lockdown. (Id., ¶ 7 and Ex. 1 at

24

48-53, 58-59.) In both situations, he initially denied guilt, leading to the scheduling of a hearing, but then admitted guilt at the hearing. He received a loss of canteen, telephone, and visitation privileges and administrative segregation for ten days for the first incident and a loss of all privileges for twenty days for the second. (Id.) He was also placed in administrative segregation as a result of cutting his wrist with the razor based on an attempt at self-harm. (Id., ¶¶ 9-10 and Ex. 1 at 73-76.) For that, he also lost canteen, telephone, and visitation privileges for 20 days after again admitting guilt at a hearing. (Id.)

### 4. Discussion

Regarding Plaintiff's medical care, Defendant Rogers is clearly entitled to summary judgment based under the standards set out previously. During Plaintiff's stay in the Detention Center, he suffered several medical issues that could arguably qualify as "serious medical needs," specifically, his broken wrist, mental health issues, boils, the self-inflicted cut to his arm, and a subsequent infection of that cut. As stated earlier, the Guilford County Sheriff at the time, B.J. Barnes, contracted with Correct Care Solutions to provide medical care in the Detention Center during the time Plaintiff was housed there. Plaintiff received almost constant care for one or more of his variety of medical needs during that time. His medical needs were not ignored, but were instead all treated, mostly successfully.

Plaintiff points to several alleged deficiencies in his treatment, but they are either unsupported by any actual evidence or do not rise to the level of constitutionally deficient treatment. Regarding the treatment of the break in Plaintiff's wrist, Plaintiff alleges that Defendants failed to provide him with surgery to correct the nerve issue that developed when it healed improperly. However, Plaintiff's own medical records reveal that the problem was

25

not apparent until mid-May of 2017 and that Plaintiff then negated the possibility of any surgery at that time by cutting his own wrist less than two weeks later. This wound did not heal until mid to late June of 2017. The records then reveal that at least by August 4, 2017, Correct Care was attempting to schedule the surgery, but that the doctor could not fit it on his schedule. Plaintiff transferred out of the Detention Center and, therefore, out of Correct Care's care before the surgery could be scheduled and performed. In no way was Correct Care and, by extension B.J. Barnes to Defendant Rogers, deliberately indifferent to the injury to Plaintiff's arm or the need for a subsequent surgery.

Plaintiff also faults Defendants for allegedly ignoring the mental issues that led him to cut his wrist. However, the records show that Correct Care did not ignore these issues, but instead spoke to Plaintiff regarding his mental health concerns just six days before he attempted to kill himself. At that time, he expressly stated that he wanted to speak with someone but did not want to harm himself, and he did not deviate from that when someone spoke with him. He points to nothing from which Correct Care or anyone else could have known of his plan to suddenly kill himself. In fact, at the time of his suicide attempt, Plaintiff specifically attributed his actions to a fight he had with his wife, an occurrence which Defendants could not have controlled or known about absent Plaintiff telling them, which he does not claim that he did prior to his suicide attempt. Again, there is evidence in the record that Correct Care paid attention to Plaintiff's mental state throughout his incarceration, including the time near to his suicide attempt. Plaintiff provides no support for his claim that Correct Care or any Defendant engaged in deliberate indifference in connection with Plaintiff's mental health.

Finally, Plaintiff attributes the infection that occurred in his wrist following his suicide attempt to unclean conditions in his cell. His allegation is entirely conclusory and he points to no evidence that the conditions caused the infection. Regardless, Correct Care promptly treated the infection, which healed sufficiently for Plaintiff to have the sutures removed from his wrist a little over two weeks after he cut it. Again, the evidence precludes a claim of deliberate indifference to any serious medical need. Therefore, Defendant Rogers is entitled to summary judgment on Plaintiff's claims of constitutionally deficient medical care. Not only this, but for the reasons just set out, the evidence is undisputed and reflects that Correct Care, its successor Wellpath, Tom Sybesma, and Nurse Erin, also did not show deliberate indifference toward Plaintiff's medical needs. This means that it would be futile to allow Plaintiff to amend his complaint to properly name any of them or to attempt further service. Moreover, even if Plaintiff had properly obtained service, dismissal is proper under 28 U.S.C. § 1915A because it is now clear that Plaintiff cannot receive relief on his claims against them.

As explained earlier, Plaintiff also complains that he was kept in segregated confinement, which he faults, at least in the briefing of this case, for putting him under mental stress that led to his suicide attempt. "By definition, pretrial detainees have not been convicted of the crimes with which they are charged. For that reason, the Supreme Court held in Bell v. Wolfish, [441 U.S. 520, 535-37 (1979),] they retain a liberty interest in freedom from 'punishment,' even while they are detained to ensure their presence at trial." Dilworth v. Adams, 841 F.3d 246, 251 (4th Cir. 2016). "[I]n determining whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of that word[,] . . . [a] court must decide whether the disability is imposed for the purpose

of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]. Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' Conversely, if a restriction or condition is not reasonably related to a legitimate goal--if it is arbitrary or purposeless--a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees. Courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility." Bell, 441 U.S. at 538-39 (internal quotations and citations omitted). Thus, "[t]o establish that a particular condition or restriction of his confinement is constitutionally impermissible "punishment," the pretrial detainee must show either that it was (1) imposed with an expressed intent to punish or (2) not reasonably related to a legitimate nonpunitive governmental objective, in which case an intent to punish may be inferred." Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988).

Here, for most of his stay in the Detention Center, Plaintiff was in medical segregation based on his multiple medical issues, which are fully supported by the record already discussed. There is no evidence that he was placed in or kept in medical segregation as any sort of punishment. While in medical segregation, Plaintiff had "the same access as the general

population to a daily shower, a shave three times per week, laundry of cloths and linens, correspondence, media, visitation, phone, a clean cell and religious guidance, social services and counseling." (Diehl Aff. ¶ 12.) He also received one hour of exercise outside his cell each day. (Id.) He suffered further restrictions only during the brief periods when he was in Disciplinary Segregation or on Suicide Watch. (Id.) Finally, as noted earlier, Plaintiff only made one official request to be transferred out of medical segregation and never requested it again. There were three brief periods of time when Plaintiff was expressly punished for disobeying orders, interfering with staff, and harming himself. However, his status as a pretrial detainee does not protect him from all punishment. Instead, a pretrial detainee can be subjected to punishment for disciplinary offenses after notice of the alleged misconduct, a hearing, and a written explanation of the resulting decision. Dilworth v. Adams, 841 F.3d 246, 253-54 (4th Cir. 2016). Plaintiff does not allege that he did not receive these due process protections for each of his disciplinary convictions. In fact, the record demonstrates that in each instance, he did receive notice, plead not guilty, have a hearing, and then admit guilt at the hearing, resulting in a written decision. For this reason, Plaintiff received all of the process he was due, and the series of brief confinements in administrative segregation as punishment for disciplinary infractions did not violate his federal constitutional rights. Defendant Rogers is entitled to summary judgment on this claim as well.

### C. Plaintiff's Motion for Summary Judgment

Plaintiff has also filed a Motion for Summary Judgment. For all of the reasons set out above, not only is Plaintiff not entitled to summary judgment, but it is the Defendants who

are so entitled and the case against them should be dismissed. Plaintiff's Motion for Summary Judgment should be denied accordingly. All of Plaintiff's claims should be dismissed.

### D. Motion to Seal

Finally, the Court notes that there is a pending Motion to Seal [Doc. #85] filed by Defendant Rogers which pertains to certain exhibits containing Plaintiff's medical records from the Guilford County Jail. Defendant Rogers filed the Motion to Seal to protect Plaintiff's privacy interest in the medical records, in order to allow Plaintiff the opportunity to present a request for sealing under Local Rule 5.4. However, Plaintiff has not filed any request for sealing under Local Rule 5.4, nor has he shown any basis or need for sealing the records. Indeed, Plaintiff has put his medical treatment at issue in this case, and Plaintiff has also filed portions of the medical records with his briefs without any request to seal. As to all of the records, the Parties have relied on those records in their briefing, and the Court has considered and cited to the records at length in this Recommendation. Given the significant First Amendment interests involved, and in light of Plaintiff's failure to present any basis or request for keeping the medical records under seal, the Court will recommend that the Motion to Seal be denied, and that the Brief and Attachments [Doc. #87, #88] be unsealed. See Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 178 (4th Cir. 1988) (setting out the standard for sealing documents protected by the common law right of access based on a weighing of "competing interests," as well as the higher standard for sealing documents protected by the First Amendment based on a showing that the restriction is "narrowly tailored" and serves a "compelling interest"); Rushford v. The New Yorker Magazine, Inc., 846 F.2d 249, 253-54

Case 1:18-cv-00709-TDS-JEP   Document 118   Filed 08/19/20   Page 30 of 31

(4th Cir. 1988) (discussing the applicability of the First Amendment protection to documents filed in connection with motions for summary judgment).

IT IS THEREFORE RECOMMENDED that the Motion to Seal [Doc. #85] be denied, and that the Brief and Attachments [Doc. #87, #88] be unsealed.

IT IS FURTHER RECOMMENDED that Defendant Rogers's Motion for Summary Judgment [Doc. #79] and Defendants Ryan and Underhill's Motion for Summary Judgment [Doc. #91] be granted, that Plaintiff's Motion for Summary Judgment [Doc. #110] be denied, that all of the claims in this case be dismissed, and that this action be dismissed in its entirety.

IT IS FURTHER RECOMMENDED that Tom Sybesma's Motion to Enforce [Doc. #76] and Plaintiff's Motion to Deny [Doc. #102] be denied as moot in light of that Recommendation.

This, the 19th day of August, 2020.


                                    /s/ Joi Elizabeth Peake
                                 United States Magistrate Judge